COMMONWEALTH of Pennsylvania, Appellee

v.

**Joseph CORNELIUS, Appellant.**

Superior Court of Pennsylvania.

Argued March 17, 2004.

Filed July 6, 2004.

Reargument Denied Sept. 15, 2004.

John L. Elash, Pittsburgh, for appellant.

Michael W. Steily, Deputy Dist. Atty., and Kevin McCarthy, Asst. Dist. Atty., Pittsburgh, for the Com., appellee.

Before: KLEIN, BENDER and JOHNSON, JJ.

BENDER, J.:

¶ 1 Joseph Cornelius (Appellant) appeals from the February 20, 2002 judgment of sentence of, in the aggregate, life imprisonment entered against him following his convictions of second degree murder, aggravated indecent assault, indecent assault, kidnapping, abuse of a corpse, and two counts of involuntary deviate sexual intercourse (IDSI).[1] We affirm.

---

1. The murder conviction is docketed in the trial court at CC200014844 and the remaining convictions are docketed in the trial court at CC200014845.

## I. *Factual History*

¶ 2 The trial court set forth the following factual background in this case:

On September 24, 2000, the victim, [S.D.], an 11 year old boy, left his grandmother's home to go outside and ride his bike down East Ohio Street [on the "North Side" of Pittsburgh]. While on this bike ride, the victim encountered [Appellant], who got the boy to accompany him into a field along the 800 block of East Ohio Street. Once there, [Appellant] proceeded to perform oral sex on the victim. After this sexual encounter, the victim reached for [Appellant's] [Walkman] cassette player. Upon determining that the victim was attempting to steal his Walkman, [Appellant] grabbed the boy, placed him on his back, climbed on top of his stomach and chest and choked him to death. [Appellant] then left the crime scene and went to a nearby tavern. After having some beers at the tavern, he returned to the crime scene and proceeded [to] use a broken beer bottle to remove the victim's genitals, make an incision down the abdominal area of the victim and pull some of the intestines from the abdominal cavity. The victim's genitals were subsequently thrown from the 9th Street Bridge. The victim's body was found on September 25, 2000 at approximately 9:44 p.m.

Trial Court Opinion (T.C.O.), 11/8/02, at 2; Appellant's brief at 8–9. During the course of the ensuing criminal investigation, tow truck operator Robert Amend told investigators that he had been sitting on East Ohio Street on Sunday, September 24, 2000, and he saw Appellant emerge from the area of the field where the victim's body was later found. N.T. Trial (Vol. 1), 9/25–27/01, at 423–24. He recognized Appellant as a street person to whom he would occasionally give money. *Id.* at 423. Based on this information, investigators sought to interview Appellant.

¶ 3 Appellant was known to local police as the West End panhandler. *Id.* at 542. On Tuesday, September 26, 2000, the day after the victim's body was found, City of Pittsburgh Police Sergeant Patricia Kelly located Appellant. *Id.* at 546. Appellant agreed to accompany her to the homicide office to speak with detectives. *Id.* Detective Regis Kelly interviewed Appellant beginning at approximately 3:15 p.m. *Id.* at 582. Appellant was alert, coherent, and cooperative during the interview. *Id.* Appellant accounted for his whereabouts on Sunday, September 24, 2000, by stating that he arrived on the North Side at seven or eight o'clock that morning and went to the area in question (where the victim's body was later found) which is a wooded area off East Ohio Street by the Interstate 279 ramp. *Id.* at 584. He took several beers with him to that area and drank them as he waited for a nearby bar to open. *Id.* He claimed to have proceeded to the bar at about 11:00 a.m. to drink and watch a Steelers' football game. *Id.* Appellant stated that, following the game at about 5:00 p.m. to 5:30 p.m., he left the North Side by crossing the Ninth Street Bridge and catching public transportation to West Liberty Avenue (an area south of downtown Pittsburgh) where he arrived at about 7:00 p.m. on the porch of an abandoned house where he was staying. *Id.* at 585. Appellant stated that he did not see a young boy on a bicycle on the day in question. *Id.* at 586–87. Following the interview with Detective Kelly, which lasted approximately two hours, police transported Appellant from the homicide office to a location of his choosing. *Id.* at 589, 655. At this point, Appellant was not considered a suspect, but was considered to be a potential witness, even though the timeline of events describing his whereabouts conflicted somewhat with Mr. Amend's ac-

count of when he had seen Appellant on the day in question. *Id.* at 589–590. Specifically, Mr. Amend indicated that he saw Appellant come out of the woods near East Ohio Street at some point after the Steelers' game, carrying a green backpack. *Id.* at 609.

¶ 4 Following the initial interview with Appellant on Tuesday, September 26, 2000, homicide detectives received additional information. Forrest Hodges, a police officer, and James Harney, a nurse employed at a North Side hospital, both stated that they saw a homeless man and a young boy with a ·bicycle talking together just off East Ohio Street under a bridge shortly after 7:00 p.m. on Sunday. *Id.* at 590–91. Officer Hodges identified the homeless man he saw as Appellant and identified the boy on the bicycle as the victim, S.D. *Id.* at 319–320. Given this information, detectives located Appellant and brought him to the homicide office on Tuesday night, September 26, 2000, for further questioning. *Id.* at 592–94. Additionally, Mr. Harney and the tow truck driver, Mr. Amend, were able to immediately identify Appellant from a photo array as the person they saw in the crime scene area on Sunday evening, at a time shortly before the murder. *Id.* at 597–99.

¶ 5 Dennis Logan, a detective with the City of Pittsburgh homicide squad, interviewed Appellant on the second occasion he was brought to the homicide office, *i.e.,* Tuesday night. N.T. Trial (Vol. 2), 9/28–29/00, at 710–711. Detective Logan and his colleague, Detective McDonald, entered the interview room and told Appellant that they wanted to talk about the death of a boy on the North Side. *Id.* at 716. Detective Logan told Appellant that prior to discussing this, he would ·read him his *Miranda*[2] rights, even though Appellant was not yet under arrest. *Id.* Detective

Logan read the rights form to Appellant, and Appellant indicated that he understood his rights and he signed the form. *Id.* at 717–719. Appellant then agreed to speak with the detectives. *Id.* at 719.

¶ 6 The detectives questioned Appellant regarding his whereabouts on Sunday, September 24, 2000. *Id.* This time, Appellant stated that he awoke at approximately 6:00 a.m. and traveled to the North Side. *Id.* at 720. Once there, he drank a couple of beers and waited for a bar to open. *Id.* He went to the bar and watched the Steelers' game, and after the Steelers' game, he left the bar and went directly back to the abandoned house on West Liberty Avenue. *Id.* at 720–721, 723. Appellant again indicated that he did not talk to any boys of the victim's age. *Id.* at 721. This interview with Detective Logan lasted approximately an hour and, at that point, Appellant was still not under arrest. *Id.* at 723. However, during the course of the interview, Detective Logan was informed that Appellant had an outstanding warrant on a different crime and that he would be transported to the Allegheny County Jail following the interview. *Id.* Appellant agreed to talk to Detective Logan the following day. *Id.* at 724.

¶ 7 The following day, Wednesday, September 27, 2000, Detective Logan transported Appellant from the county jail back to the homicide office to continue the interview. *Id.* at 726. Appellant was "still pretty jovial, talking" and indicated his willingness to continue the interview. *Id.* Detective Logan again read Appellant his rights. *Id.* at 729. Appellant again indicated his understanding of each right and signed a rights form, but he was still not under arrest or charged at this point. *Id.* at 729–732. During this interview, Appellant admitted, contrary to his prior state-

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ments, that he did not leave the North Side immediately after the football game but had, rather, stayed on the North Side to panhandle for a while and then proceeded home to West Liberty Avenue. *Id.* at 737. Appellant then admitted that he did not actually take public transportation home and, according to Detective Logan's testimony, Appellant admitted that "he was with the kid and then he went on further to say that he, indeed, had killed the kid, but it was an accident." *Id.* at 738. At that point, Detective Logan stopped the interview and informed Appellant "that he was under arrest and charged with criminal homicide, he was no longer free to go pertaining to that charge." *Id.* at 739. Appellant indicated his understanding. *Id.*

¶ 8 Appellant then recounted the events surrounding the murder of the victim. *Id.* Essentially, Appellant admitted that he was panhandling after the Steelers' game when he encountered the victim on his bicycle. *Id.* at 741. He said the victim asked him many questions as he was panhandling. *Id.* at 741–742. Appellant went back to his secluded spot off East Ohio Street to drink more beer. *Id.* at 742. The victim followed. *Id.* At this point, Appellant admitted that he gave the victim five dollars to perform a sex act. *Id.* During the course of the sex act, the victim stopped and told Appellant that he did not like doing it. *Id.* at 743. At that point, Appellant stated that the victim's attention was drawn to Appellant's radio. *Id.* Appellant said that as the victim mentioned the radio and reached for it, Appellant got mad, grabbed the victim, threw the victim to the ground, straddled and sat on the victim's chest and stomach, and strangled the victim to death. *Id.* Appellant admitted that he knew the victim was dead at this point. *Id.* at 744. Appellant indicated that he knew that he had to do something with the victim's body, but

"needed time to think." *Id.* He went to a nearby bar for awhile. *Id.* He stated that he recalled a "case from Oklahoma" where a child was killed and mutilated by his attacker. *Id.* Appellant said "that's when he decided to go back to where he left [S.D.]'s body and do the same thing to the body to make it look like a pedophile had killed [S.D.] as opposed to a homeless person." *Id.* at 744–745. Appellant admitted returning to the crime scene, and admitted the following, as recounted in Detective Logan's trial testimony:

> After he had [S.D.] naked, [Appellant] said he turned [S.D.] on his stomach and with the middle finger of his left hand he stuck his finger into the rectum of [S.D.] and moved it around inside out to make it look as though [S.D.] had been molested. After he was done with his finger with [S.D.], [Appellant] said that he turned the little boy back onto his stomach. And when he put [S.D.] on his stomach, according to [Appellant], he posed [S.D.]'s hands behind him in a position ... to make it look as though a pedophile had committed this crime.... [Appellant] said that he looked around the area for a beer bottle ... [and] he found one that was already broken.... And with this beer bottle, after he found it, he went back to [S.D.]'s body. At this point he started to cut off [S.D.]'s genitals, his penis and his testicles.
>
> ...
>
> .... After [Appellant] cut off his genitals, he used the glass to open up [S.D.]'s chest and stomach. And [Appellant] said that after he opened up [S.D.]'s chest and stomach, he played with his organs and pulled his intestines out a little bit just to make it, once again, to appear that a pedophile had committed this particular crime.
>
> ...

After [Appellant] had cut up [S.D.], he said that he [put the victim's genitals, the glass, the radio, and the victim's pants which he used to wipe the blood off of his hands, into a plastic bag]. . . . He walked across the 9th Street Bridge. He got to the middle of the bridge and he threw the items [in the bag] into the river . . . . .

*Id.* at 745–748. Following this non-taped confession, Detective Logan went over the story again with Appellant who confirmed that the notes Detective Logan had been taking during the interview were accurate. *Id.* at 749. Appellant signed Detective Logan's notes. *Id.* at 752. Appellant then agreed to confess on tape. *Id.* at 750. Detective Logan testified that the taped confession was slightly different from the non-taped version primarily because, on the taped version, Appellant adds that he tried to perform CPR on the victim after choking him to death and before going to the bar. *Id.* At trial, the jury listened to Appellant's taped confession and was provided with a transcript of the same. *Id.* at 751.[3]

¶ 9 After the taped confession concluded, Detective Logan transported Appellant to be arraigned at the Allegheny County Coroner's Office. *Id.* at 764–765. Thus, on Wednesday, September 27, 2000, at 6:41 p.m., Appellant appeared before Deputy Coroner Timothy Uhrich for arraignment. Although the arraignment was not transcribed, the "Allegheny County Coroner's Office Criminal Arraignment Procedure," form outlined what transpired between the coroner and Appellant at this arraignment. *See* Allegheny County Coroner's Office Criminal Arraignment Procedure, 9/27/00 ("Arraignment form"). For example, an area on the form indicates that the coroner

read charges from the criminal complaint filed against Appellant and then asked Appellant if he understood the charges against him, to which Appellant indicated "yes sir." *Id.* at 1. Then the coroner read Appellant his constitutional rights as indicated on the arraignment form:

I want to advise you of your constitutional rights:

1. You have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

3. You have the right to talk to an attorney and to have him or her present with you while you are being questioned.

4. If you cannot afford an attorney, one will be appointed for you free of charge.

*Id.* at 2. Appellant indicated "yes sir" when asked if he understood these rights. Then Appellant answered "no" when asked if he had an attorney. *Id.*

¶ 10 Thus began the exchange which is primarily at issue in this appeal. *See infra.* After Appellant answered "no" to the question of whether he had an attorney, the coroner asked Appellant, in accordance with the arraignment form, "[d]o you wish that the Allegheny County Coroner's Office contacts [sic] the Allegheny County Public Defender's Office to represent you?" Arraignment form at 2. Appellant answered "yes sir" to this question. *Id.* Then the coroner indicated that he was setting the date and time for Appellant's preliminary hearing as Friday, October 6, 2000, at 2:00 p.m. *Id.* Finally, Appellant signed his name to the statement on the form that read as follows: "I hereby acknowledge that I have been notified of the time and date of my preliminary hearing[,]" and the arraignment procedure essentially ended. *Id.* at 3. *See also* N.T.

---

**3.** We also listened to the tape recording of Appellant's confession to the crimes during our review of this case.

Trial (Vol. 2) at 767 (outlining same arraignment procedure as per the trial testimony of Detective Logan who was present at the arraignment).

¶ 11 In his trial testimony, Detective Logan explained that after the arraignment, he traveled with Appellant around the North Side area as Appellant pointed out various places he had been on the day of the crimes, including the Ninth Street Bridge where he threw the bag into the river and the area off East Ohio Street where the victim's body was found. N.T. Trial (Vol. 2) at 768–770. Detective Logan indicated that they "did not stop and get out," but rather "stayed on the road" and "went past the scene" where the body was found. *Id.* at 769. The only time Appellant got out of the car during this excursion was on the Ninth Street Bridge where he had thrown the bag into the river. *Id.* at 770.

¶ 12 The following day, Thursday, September 28, 2000, Detective Kelly and his partner transported Appellant from the county jail to the homicide offices to discuss with Appellant a matter unrelated to the crimes in this case. N.T. Trial (Vol. 3), 10/2–6/01, at 1559. The detectives placed Appellant in their squad car and, during the transport, Appellant made "gratuitous remarks" to the detectives. *Id.* at 1560. For example, after they put Appellant in the squad car upon leaving the jail, the detectives locked the car door and Appellant stated, "[t]here's no need to lock the door, I won't be trying to escape. After my picture has been in the news and on the news and in the newspapers I wouldn't last … an hour on the street after what I did." *Id.* Detective Kelly also testified that, as they were leaving the jail, Appellant "made a comment about … how he was afraid to eat the food in the jail, and

that … it was his belief that … the other prisoners wanted to kill him after what he had done." *Id.* at 1562–1563. Detective Kelly also testified that Appellant "made a comment as to the fact that people would want to kill him after what he did, and then he stated to us, [y]ou probably want to kill me after what I've done." *Id.* at 1561. In response, the detectives told Appellant that they "weren't there to judge him, that [they] intended to treat him fairly. . . ." *Id.* Appellant then said that he had already confessed to the other detectives on tape. *Id.* at 1562. Detective Kelly and his partner told Appellant that they were not there to speak to him about the instant case. *Id.* Detective Kelly testified that when they arrived at the homicide office, Appellant said "that he just wanted to plead guilty and get this over with. He stated that he had brought enough embarrassment on his family and that he didn't want to put the victim's family through a trial." *Id.* at 1563. Once at the homicide office, Detective Kelly accompanied Appellant to the rest room, where Appellant asked him whether police found the bag he threw off the Ninth Street Bridge. *Id.* at 1564. Appellant also told Detective Kelly that he had taken other detectives to the "spot where he had thrown the bag off and that they had marked the spot." *Id.* Detective Kelly responded by telling Appellant that he did not know if the bag had been recovered and "once again told him that we were not here to talk to him about the [S.D.] investigation." *Id.* Subsequently, during an interview with Detective Kelly, Appellant made another comment about the [S.D.] case to the effect that "the news media was making him out to be a pedophile, and he stated that this was the only time that he had ever done anything like this." *Id.* at 1567.[4]

4. Appellant's statements, as described in this paragraph, will be hereinafter referred to collectively as gratuitous or spontaneous remarks or statements.

## II. *Procedural History*

¶ 13 On June 22, 2001, Appellant filed a motion to suppress his inculpatory statements. On June 25 and 26, 2001, the parties argued Appellant's suppression motion, and the trial court held a hearing on the suppression motion on June 27 and 29, 2001. On July 6, 2001, the trial court, the Honorable John A. Zottola, who also presided at trial, denied Appellant's motion in part and granted it in part. *See* N.T. Rulings on Suppression Motion, 7/6/01. Most significant herein, Judge Zottola denied Appellant's motion to suppress all evidence obtained following Appellant's arraignment, including evidence obtained during the post-arraignment visit to or "tour" of the crime scene, whereby police drove Appellant around the crime scene as Appellant pointed-out and described inculpatory events associated with these locations. *Id.* at 5–6.

¶ 14 Appellant proceeded to trial before a jury in September and October of 2001. On October 6, 2001, the jury convicted Appellant of second degree murder, aggravated indecent assault, indecent assault, kidnapping, abuse of a corpse, and two counts of IDSI. N.T. Trial (Vol. 3) at 2004.

¶ 15 On February 28, 2002, Judge Zottola sentenced Appellant to an aggregate sentence of life imprisonment without the possibility of parole. Appellant filed this timely appeal.

## III. *Issues*

¶ 16 Appellant raises the following two questions in this appeal:

I. WHETHER [APPELLANT] INVOKED HIS RIGHT TO COUNSEL AT HIS ARRAIGNMENT AND WHETHER STATEMENTS SUBSEQUENTLY OBTAINED FROM [APPELLANT] VIOLATED HIS RIGHT TO COUNSEL UNDER THE PENNSYLVANIA CONSTITUTION AND THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION?

. . .

II. WHETHER THE COURT OF COMMON PLEAS ERRED IN NOT PERMITTING DR. LEO TO TESTIFY ON THE SPECIFICS OF [APPELLANT'S] CASE, THUS VIOLATING [APPELLANT'S] RIGHTS UNDER THE PENNSYLVANIA CONSTITUTION AND UNITED STATES CONSTITUTION TO DUE PROCESS AND A FAIR TRIAL?

Appellant's brief at 3. We will now examine these issues in the order presented.

## IV. *Sixth Amendment Right to Counsel*

■■■■ ¶ 17 With regard to the first issue, we must determine if the trial court erred by refusing to suppress certain evidence obtained following Appellant's arraignment pursuant to an alleged violation of Appellant's Sixth Amendment right to counsel. When reviewing the denial of a suppression motion, we are guided by the following:

> In reviewing the denial of a motion to suppress, our responsibility is to determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. If the suppression court held for the prosecution, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, the appellate court may reverse if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. Zook*, 2004 PA Super 174, ¶ 5, 851 A.2d 178, 180–81 (2004) (quoting *Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177, 178–179 (1992) (citation omitted)).

¶ 18 As mentioned above, Appellant said "yes sir" when the deputy coroner, at his arraignment, asked Appellant, "[d]o you wish that the Allegheny County Coroner's Office contacts [sic] the Allegheny County Public Defender's Office to represent you?" *See* Allegheny County Coroner's Office Criminal Arraignment Procedure, 9/27/00, at 2. Judge Zottola concluded that by answering "yes sir" Appellant did not invoke his right to counsel at the time of the arraignment and, therefore, Judge Zottola denied Appellant's motion to suppress evidence obtained following arraignment. N.T. Rulings on Suppression Motions at 5–6. In this appeal, Appellant argues that his Sixth Amendment right to counsel attached automatically at his arraignment and that he unambiguously asserted such right when he answered "yes sir" to the deputy coroner's question of whether he wanted counsel. Appellant's brief at 16–17. Accordingly, Appellant argues that his Sixth Amendment right to counsel was violated when, absent waiver of such right, the police discussed the case with Appellant (as during the "tour") following Appellant's request for counsel at his arraignment. *Id.* at 11. Appellant further contends that his subsequent cooperation following the arraignment (*e.g.,* during the "tour") did not act as a waiver of his initial invocation, at his arraignment, of his Sixth Amendment right to counsel. *Id.* at 17.

¶ 19 We conclude initially that Appellant's argument has merit—his Sixth Amendment right to counsel was violated. However, we further conclude that the trial court's decision not to suppress evidence obtained in violation of Appellant's right to counsel constituted harmless error. The reasoning underlying our conclusions follows.

¶ 20 The Sixth Amendment to the United States Constitution provides, *inter alia,* that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." [5] The United States Supreme Court recently visited the issue of the Sixth Amendment right to counsel in *Fellers v. United States,* 540 U.S. 519, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004). The Court explained that:

[t]he Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). [6] We

---

5.  Article I, Section 9 of the Pennsylvania Constitution also provides for rights of the accused in criminal prosecutions and is the analogous provision to the federal constitution's Sixth Amendment. Notably distinguishable, however, is that this section of the Pennsylvania Constitution does not provide an express right to assistance of counsel. In any event, the parties do not rely on any provision of the Pennsylvania Constitution in this appeal. *See, generally Commonwealth v. Mayhue,* 536 Pa. 271, 639 A.2d 421, 435 n. 11 (1994).

6.  In *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Supreme Court noted the commonly-cited quotation from *United States v. Gouveia,* 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984), describing the impact of the initiation of formal proceedings and the contemporaneous triggering of the Sixth Amendment right to counsel:

[G]iven the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right

have held that an accused is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents ... deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); cf. *Patterson v. Illinois,* [487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988)], *supra* (holding that the Sixth Amendment does not bar postindictment questioning in the absence of counsel if a defendant waives the right to counsel).

*Id.* at ——, 124 S.Ct. at 1022–23. *See also Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) ("Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him[.]"). In *Michigan v. Jackson,* the Supreme Court stated:

> Indeed, after a formal accusation has been made—and a person who had previously been just a "suspect" has become an "accused" within the meaning of the Sixth Amendment—the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation.

*Jackson,* 475 U.S. at 632, 106 S.Ct. 1404.

¶ 21 In the instant case, Appellant's Sixth Amendment right to counsel certainly attached by the time of his arraignment, if not at the time of his arrest. *Compare Commonwealth v. Karash,* 513 Pa. 6, 518 A.2d 537, 541 (1986) (noting that in Pennsylvania, arrest triggers Sixth Amendment right to counsel), *with Jackson,* 475 U.S. at 629–630, 106 S.Ct. 1404 ("The arraignment signals 'the initiation of adversary judicial proceedings' and thus the attachment of the Sixth Amendment ... thereafter, government efforts to elicit information from the accused, including interrogation, represent 'critical stages' at which the Sixth Amendment applies."). The parties do not contest this point. Rather, they couch their arguments in terms of whether Appellant "invoked" his right to counsel when he said "yes sir" after the deputy coroner asked Appellant if he wanted them to arrange for a public defender, and whether subsequent inculpatory statements were obtained in violation of Appellant's Sixth Amendment rights.

■■■ ¶ 22 The Commonwealth asserts that the Sixth Amendment right to counsel "is not self-effectuating, rather, the accused is required to make an unambiguous assertion of the right." Commonwealth's brief at 16. We disagree. Rather, "[t]he right to counsel does not depend upon a

to counsel attaches at the initiation of adversary judicial criminal proceedings 'is far from a mere formalism.' It is only at that time 'that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.

*Jackson,* 475 U.S. at 631, 106 S.Ct. 1404 (quoting *Gouveia,* 467 U.S. at 189, 104 S.Ct. 2292 (internal citations omitted)). The *Jackson* Court went on to state that an accused has, after the initiation of formal judicial proceedings, "the right to rely on counsel as a 'medium' between him and the State." *Id.* at 632, 106 S.Ct. 1404 (citation omitted).

request by the defendant" and "[i]t is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request." *Jackson*, 475 U.S. at 633 n. 6, 106 S.Ct. 1404 (citations omitted). It is possible that the Commonwealth is confusing the express right to counsel provided in the Sixth Amendment with the right to counsel conferred by *Miranda* in a Fifth Amendment context, the latter of which attaches *"only when such counsel is requested during custodial interrogations."* *Jackson*, 475 U.S. at 639 n. 2, 106 S.Ct. 1404 (Rehnquist, J. dissenting). The "right to counsel" conferred by *Miranda* "exists solely as a means of protecting the defendant's Fifth Amendment right not to be compelled to incriminate himself." *Id.* These precepts are relevant in the instant case because, despite the Commonwealth's suggestion to the contrary, Appellant was not required to "invoke" his Sixth Amendment right to counsel at his arraignment in order for such right to attach. Again, the triggering event for attachment of the Sixth Amendment right to counsel is not a defendant's "request" for counsel, but is, rather, the initiation of the judicial proceedings.

¶ 23 Even if, *arguendo*, Appellant was required to affirmatively assert his desire for counsel at his arraignment in order for his Sixth Amendment right to counsel to attach, we find that Appellant did so when he answered "yes sir," thereby unambiguously communicating his desire for counsel when questioned at his arraignment by the deputy coroner. In circumstances where a request for counsel is made, we are to give a "broad, rather than a narrow, interpretation to a defendant's request for counsel—we presume that the defendant requests the lawyer's

services at every critical stage of the prosecution." *Jackson*, 475 U.S. at 633, 106 S.Ct. 1404 (footnote omitted). The main holding in *Jackson* is "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* at 636, 106 S.Ct. 1404. It would follow then, that in the absence of waiver, as in the instant case, a request for counsel provides an even stronger argument supporting the protections of the Sixth Amendment right to counsel. As noted in *Jackson*:

Once the right to counsel has attached and been asserted, *the State* must of course honor it. This means more than simply that *the State* cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on *the State* an affirmative obligation to respect and preserve the accused's choice to seek this assistance.

*Id.* at 634 n. 8, 106 S.Ct. 1404 (quoting *Maine v. Moulton*, 474 U.S. 159, 170–171, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)). *See also Brewer*, 430 U.S. at 401, 97 S.Ct. 1232 ("[O]nce adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him.").

¶ 24 In *Fellers*, the Supreme Court found a Sixth Amendment violation in the absence of waiver and in the absence of any assertion of the right to counsel. *Compare Jackson, supra.* The defendant (Fellers) claimed, *inter alia*, that his Sixth Amendment right to counsel was violated when, following his indictment for conspiracy to distribute methamphetamine (which signaled the initiation of judicial proceedings), police arrived at his house to arrest him. *Fellers*, at ——, 124 S.Ct. at 1021.[7]

7. The Sixth Amendment attached despite the fact that Fellers did not request counsel or "invoke" his right to counsel.

Upon arriving at Fellers' house, the police told him that they had a warrant for his arrest pursuant to his indictment, and that they were there to discuss his involvement in methamphetamine distribution. *Id.* Fellers made inculpatory statements. *Id.* Police then transported Fellers to jail and, for the first time, advised Fellers of his rights under *Miranda* and *Patterson. Id.* The Supreme Court concluded that the police deliberately elicited information from Fellers at his home by informing him that their purpose was to discuss his involvement in methamphetamine distribution. *Id.* at ——, 124 S.Ct. at 1023. The Court held that Fellers' Sixth Amendment right to counsel was violated because the discussion at Fellers' home "took place after [Fellers] had been indicted, outside the presence of counsel, and in the absence of any waiver of [Fellers'] Sixth Amendment rights." *Id.*[8] In reversing the Court of Appeals' decision, the Supreme Court stated:

> [T]here is no question that the officers in this case "deliberately elicited" information from [the defendant]. Indeed, the officers, upon arriving at [the defendant's] house, informed him that their purpose in coming was to discuss his involvement in the distribution of methamphetamine and his association with certain charged co-conspirators. Because the ensuing discussion took place *after petitioner had been indicted, outside the presence of counsel, and in the absence of any waiver of petitioner's Sixth Amendment rights*, the Court of Appeals erred in holding that the officers' actions did not violate the Sixth Amendment standards established in *Massiah, supra,* and its progeny.

*Fellers,* 540 U.S. at ——, 124 S.Ct. at 1023 (citations omitted, emphasis added).

¶ 25 Thus, when police deliberately elicit information from a defendant (following indictment under circumstances where counsel is absent and the right to counsel is not waived), the police are, in effect, interfering with the defendant's Sixth Amendment right to counsel. *See United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). In *Henry,* the Supreme Court found "deliberate elicitation" where the defendant was incarcerated and made inculpatory statements to a fellow inmate who was an FBI informant. The Court said that "if the Sixth Amendment 'is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse.'" *Id.* at 273, 100 S.Ct. 2183 (quoting *Massiah,* 377 U.S. at 206, 84 S.Ct. 1199).

■ ¶ 26 Under the discrete facts of the instant case, it is clear that by the time of

---

**8.** The circumstances in the instant case are akin to those in *Fellers,* but are distinguishable from those in *Patterson, supra.* In *Patterson,* after the defendant's indictment, police gave him *Miranda* warnings and the defendant waived his right to counsel just prior to the times when he gave inculpatory statements. The Court stated that "as a general matter," with certain exceptions, the information contained in the *Miranda* warnings was sufficient not only to inform the defendant of his Fifth Amendment right to counsel during custodial interrogation, but was also sufficient to inform the defendant of his Sixth Amendment right to counsel at post-indictment interrogation. *Patterson,* 487 U.S. at 296, 108 S.Ct. 2389. In the instant case, the deputy coroner read *Miranda* warnings to Appellant at his arraignment but, instead of waiving his rights, Appellant requested counsel. Thus, although Appellant was, arguably, sufficiently apprised of his Sixth Amendment right to counsel for the limited purpose of post-arraignment questioning, *see Patterson,* 487 U.S. at 298, 108 S.Ct. 2389, there is no indication that Appellant waived this right at any relevant time.

his arraignment, Appellant's Sixth Amendment right to counsel had already attached and he neither had counsel present nor did he waive his Sixth Amendment right to counsel when subsequent inculpatory statements were obtained. *See Fellers*, 540 U.S. at ——, 124 S.Ct. at 1023. Accordingly, we must next ask whether the police "deliberately elicited" certain inculpatory information from Appellant. In this regard, we conclude that the inculpatory statements made by Appellant during the "tour" of the crime scene with police in their squad car constituted a "deliberate elicitation" of information from Appellant by police and, therefore, should have been suppressed. *See Henry*, 447 U.S. at 274, 100 S.Ct. 2183 ("By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel."). It is difficult to accept the Commonwealth's position that this tour, in which police drove Appellant around the crime scene in their squad car, obviously intending to elicit inculpatory statements from Appellant, did not constitute "deliberate elicitation." The police "toured" him around the crime scene and related areas on the North Side so that Appellant could further describe the crimes in the context of the actual crime scene and related areas.

¶ 27 Furthermore, and contrary to the Commonwealth's position, Appellant's acquiescence to the tour of the crime scene with investigators does not constitute a valid waiver of his Sixth Amendment right to counsel. After the Sixth Amendment right to counsel attaches, a valid waiver of such rights "should not be inferred from the mere response by the accused to overt or more subtle forms of interrogation or other efforts to elicit incriminating information." *Jackson*, 475

U.S. at 635 n. 9, 106 S.Ct. 1404. *See also Brewer*, 430 U.S. at 403–404, 97 S.Ct. 1232 (describing heavy burden on Commonwealth to establish waiver of Sixth Amendment right to counsel and indicating "that it was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege' " to establish waiver) (citation omitted). Accordingly, the Commonwealth has not met its heavy burden to establish that Appellant waived his Sixth Amendment right to counsel by merely acquiescing to the "tour" of the crime scene.

¶ 28 In contrast to the inculpatory statements made by Appellant during the tour of the crime scene, the gratuitous remarks made by Appellant on Thursday, September 28, 2000, during, and shortly after, his transport from the county jail to the homicide offices on a matter unrelated to the crimes in this case, *see* N.T. Trial (Vol. 3) at 1559, were not the result of deliberate elicitation by police. As described in detail, *supra*, under "Factual History," Appellant at that time blurted-out several statements pertaining to this case. Thereafter, he blurted-out other inculpatory statements to Detective Kelly after arriving at the homicide office. *See* "Factual History," *supra*. Appellant blurted-out these statements, despite the detectives' repeated indication to Appellant that they were not there to discuss the instant case. These gratuitous remarks were not in response to any police questioning or comments or any other overt or surreptitious "deliberate elicitation" on the part of the detectives and were, therefore, properly introduced at trial. The trial court did not err by refusing to suppress Appellant's gratuitous inculpatory statements. *See also, e.g., Massiah*, 377 U.S. at 210, 84 S.Ct. 1199 (White, J. dissenting) (suggesting that spontaneous statements

not elicited by governmental action may be introduced at trial).

### V. Harmless Error

■ ¶ 29 Despite our conclusion that inculpatory statements made at the time of the tour of the crime scene should have been suppressed, we nevertheless find that, to the extent that police violated Appellant's Sixth Amendment right to counsel, the associated failure to suppress statements made during the tour constituted harmless error.

Under the rule in the seminal case of *Commonwealth v. Story*, 476 Pa. 391, 406, 383 A.2d 155, 162 (1978), we will only consider an error to be harmless when the Commonwealth is able to establish beyond a reasonable doubt that the error was harmless. This burden is satisfied when the Commonwealth is able to show, (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Mayhue*, 639 A.2d at 433. *See also Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 549 n. 37 (2002) ("An error is considered harmless when, in light of the overwhelming evidence of guilt, the error was so insignificant that it could not have contributed to the verdict.") (citation omitted). In the instant case, the pre-arraignment confessions and DNA evidence constituted overwhelming evidence of guilt against Appellant.

■ ¶ 30 We first note that Appellant does not argue that his pre-arraignment confessions were improperly admitted. Therefore, we will consider these pre-arraignment confessions in our harmless error analysis. Appellant's pre-arraignment confessions provided extensive detail about the crimes. As described in the "Factual History" section of this opinion, *supra*, Appellant explained what occurred prior to, during, and after the murder of the victim. His explanations were consistent with the condition of the victim's body, which had been discovered the day after the murder pursuant to police investigation independent of any information provided by Appellant.

¶ 31 Additionally, the Commonwealth introduced ample DNA evidence probative of guilt. One of the blood samples found on Appellant's pants matched the victim's DNA with a random frequency of 1 in 290,000 unrelated individuals. N.T. Trial (Vol. 2) at 1048. Testing of a blood stain on Appellant's backpack revealed a match of the victim's DNA with a random frequency of 1 in a quadrillion unrelated individuals. *Id.* at 1050. Another blood stain on the backpack matched the victim's DNA profile with a random frequency of 1 in 84 trillion unrelated individuals. *Id.* at 1050. The strangulation marks on the victim's neck were swabbed for DNA testing, and disclosed a match with Appellant's DNA (assuming two sources of DNA) with a random frequency of 1 in 4.8 million. *Id.* at 1051–52, 1056.

¶ 32 Finally, the post-arraignment gratuitous remarks made by Appellant without deliberate elicitation by the police were properly admitted at trial. *See* "Sixth Amendment Right to Counsel," *supra*. These were inculpatory remarks probative of guilt.

¶ 33 The above-noted evidence (*i.e.*, the pre-arraignment confessions, DNA evi-

dence, and post-arraignment gratuitous remarks) is not challenged by Appellant in this appeal. In light of the overwhelming amount of "properly admitted and uncontradicted evidence of guilt[,]" we conclude that the "prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Mayhue*, 639 A.2d at 433. The violation of Appellant's Sixth Amendment right to counsel resulting in improper admission of Appellant's inculpatory statements that were derived from the post-arraignment crime scene "tour" constituted harmless error.

### VI. *Dr. Leo's Testimony*

¶ 34 Appellant called Richard A. Leo, Ph.D., J.D., to testify as an expert in the field of false confessions. N.T. (Vol. 3) at 1782. The Commonwealth objected to Dr. Leo's testimony on the basis that he had no familiarity with police interrogation methods in the City of Pittsburgh, Allegheny County. *Id.* The trial court overruled the Commonwealth's objection and permitted Dr. Leo to testify generally about false confessions. *Id.* For example, Dr. Leo testified that, as a general matter, police are trained to interrogate to get a suspect whom they believe is guilty to confess. *Id.* at 1786. He testified that, even though police do not want or intend to elicit false confessions, they nevertheless use coercive techniques to convince a suspect that it is in his best interest to confess. *Id.* at 1788–93. Such techniques include accusing the suspect, presenting him with real or imagined inculpatory evidence, attacking a suspect's alibi as irrational, etc. *Id.* at 1787–88.

¶ 35 However, after the re-cross examination of Dr. Leo by the Commonwealth, Appellant asserted that the Commonwealth opened the door to permitting Dr. Leo to testify to the specific facts of the instant case. *Id.* at 1818. The trial court ruled that no such door had been opened and refused to allow Dr. Leo to testify with regard to the specificities of this case. *Id.* The trial court further stated that the attorneys on each side could argue the facts of this case against the testimony of Dr. Leo in their closing arguments. *Id.*

¶ 36 Appellant now argues that the trial court should have permitted Dr. Leo to testify about the effects of "specific conditions of [Appellant's] confinement and interrogation ... on the voluntariness of a confession (without rendering an opinion on whether [Appellant's] confession was involuntary or the credibility of the police officers or other prosecution witnesses[.] )" Appellant's brief at 22.

¶ 37 Appellant's argument is problematic in that he fails to explain what Dr. Leo would have said with regard to the conditions of Appellant's interrogations. Presumably, as the party calling Dr. Leo, Appellant sought to establish that Appellant's confession was involuntary. This issue is waived because Appellant has failed to explain what conditions of Appellant's interrogation led his confessions to be allegedly involuntary. We cannot review the issue because of Appellant's limited development of the argument. Pa.R.A.P. 2119(a).

¶ 38 For the foregoing reasons, the judgment of sentence is affirmed.

¶ 39 Judgment of sentence affirmed.