J-S49023-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ORLANDO NUNEZ-FLORES | |
| Appellant | No. 218 MDA 2018 |

Appeal from the Judgment of Sentence Entered December 20, 2017
In the Court of Common Pleas of Lebanon County
Criminal Division at No.: CP-38-CR-0001001-2017

BEFORE:  SHOGAN, J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.:                **FILED DECEMBER 04, 2018**

Appellant Orlando Nunez-Flores appeals from the December 20, 2017 judgment of sentence entered in the Court of Common Pleas of Lebanon County ("trial court"), following his jury convictions for robbery in the first degree, conspiracy to commit robbery in the first degree, robbery in the second degree, conspiracy to commit robbery in the second degree, theft by unlawful taking, conspiracy to commit theft by unlawful taking, receiving stolen property, conspiracy to receive stolen property, terroristic threats, and simple assault.[1]  Upon review, we affirm.

The facts and procedural history of this case are uncontested.  In connection with an armed robbery of a Fulton Bank branch office (the "Bank")

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(ii), 903(a)(1), 3701(a)(vi), 3921(a), 3925(a), 2706(a)(1), and 2701(a)(3), respectively.

in Schaefferstown, Lebanon County, Appellant was charged with the foregoing

offenses. The case proceeded to trial. As summarized by the trial court:

> At trial, the Commonwealth first called Lisa Marie Bickel, a teller at the [] Bank . . . . Ms. Bickel testified that on April 6, 2007, around 11:30 in the morning, she was working at the Bank when she first heard some commotion and yelling when she looked up to see a man in the lobby of the Bank waving a gun in the air and yelling "get down or I'm going to shoot." Ms. Bickel got down and then observed the perpetrator attempt to enter the teller area, but was unable to unlock the door, so he jumped over the counter. The perpetrator then pulled a bag out of his pocket and demanded that another teller, named Susan Tucker, put money into the bag. Ms. Tucker started at her own station and pulled the money out of the drawer and placed it into the bag, and then moved to the station to her left and did the same, after which the man pointed the gun at Ms. Tucker and she continued to move down each station and removing the money from the drawer and putting the money into the bag. After having taken the money from the various drawers, the perpetrator then jumped the counter and ran out the front door and to a waiting vehicle. Ms. Bickel described the perpetrator who came in as wearing a camouflage jacket drawn tight to his face, sunglasses, white gloves with red fingertips on them, jeans, sneakers and spoke in broken English with a Spanish accent. She also stated that as the suspect was waving the gun around, she was in fear that she might be shot by the suspect.

> While Ms. Bickel was testifying, the Commonwealth introduced and reviewed surveillance video from inside the Bank. Ms. Bickel provided brief narration of the video corresponding with her testimony. The day after the robbery, a State Trooper came into the Bank and gave a description of the individuals they had caught and indicated that one of the individuals walked with a limp. Ms. Bickel remembered that a man had come into the bank the day before the robbery asking to change a hundred dollar bill, but she was unable to provide change since he was not a bank customer. As the man exited the Bank, Ms. Bickel noticed that the man walked with a limp. There was surveillance video of the man the day before the robbery as well and the Commonwealth presented still photographs form the video. Ms. Bickel identified co-Defendant, [Roberto] Hernandez, as the man who entered the bank the day before the robbery. On cross-examination, Ms. Bickel admitted that she was unable to physically identify the suspect who robbed the bank on April 6, 2017 due to the heavy clothing worn by the suspect.

> The Commonwealth next called Heidi Swonger, a customer service representative with the Bank as a witness. Ms. Swonger testified that on April 6, 2017, at about 11:00 A.M., she was in her office when she noticed her manager looking toward the

entrance of the Bank with her hands up and then saw a man enter with a gun pointed at her manager. Realizing that the Bank was being robbed, Ms. Swonger then pushed the alarm button on her desk to notify the security department and the State Police. With the perpetrator instructing everyone to get down, Ms. Swonger got down onto the ground and shifted to the side of her desk so that she could watch what was happening. After the perpetrator entered the Bank with a gun pointed at her manager, Ms. Swonger observed the perpetrator attempt to get through the teller door, which was locked. Unsuccessful at opening the teller door, the perpetrator then jumped over the counter of the second teller window, pointed the gun at Ms. Tucker and pulled out a gray Wal-Mart bag while demanding that Ms. Tucker give him all the money. The perpetrator then followed Ms. Tucker to each teller station, gathering the money from each drawer, and then jumped back over the counter exiting through the front door. Ms. Swonger was then presented with a gray Wal-Mart bag listed as Exhibit 14, which she identified as similar to the bag that the perpetrator used the day of the robbery.

Ms. Swonger further testified that after the perpetrator left the Bank, she proceeded to the second set of doors at the entrance and observed the perpetrator walking down the street and getting into the front passenger side of a gray, four-door sedan that was parked in an alley, travelling west toward Lebanon. Ms. Swonger was shown a picture of co-Defendant, Hernandez's vehicle and identified the vehicle as the sedan she saw the day of the robbery. The Commonwealth also presented Ms. Swonger with the still photographs of the day before the robbery. Ms. Swonger indicated that she observed the interaction between Ms. Bickel and the individual the day before the robbery and identified co-Defendant Hernandez as the individual who came into the Bank looking to change the one-hundred dollar bill.

Susan Tucker, the teller at the Bank with whom the suspect interacted also took the stand as a witness for the Commonwealth. Ms. Tucker testified that on April 6, 2017, the suspect entered the Bank dressed in the camouflage jacket with the hood pulled tight around his face, but that she could see the suspect had dark skin from her observation of his nose and cheeks. Ms. Tucker stated that the suspect had the gun pointed at her as he told everyone to get down. Ms. Tucker remembered the suspect continuing to use the gun to point after he jumped the counter. Ms. Tucker noted that in each active drawer, there is a special money stack containing a GPS tracker that is activated through a pressure sensor plate and during the April 6, 2017 robbery, she pulled the GPS-enabled stacks of money from each drawer and placed them into the Wal-Mart bag that the suspect gave to her.

The Commonwealth next called Laura Sutherly as a witness. Ms. Sutherly testified that she is a regional first responder for Fulton Bank, which means that she responds to a bank robbery within her region, including the Schaefferstown branch. On April 6, 2017, Ms. Sutherly responded to a report from the Bank of a

- 3 -

robbery and, upon arrival, helped to secure the location for the ensuing investigation and to ensure that there was assistance from the human resources department for the affected employees. Ms. Sutherly also testified that she performed an audit at the Bank to determine the amount of stolen money and found that the robbery resulted in a total loss of $2963.00

Chief Michael Lee Lesher ("Chief Lesher") of the South Lebanon Township Police Department testified that on April 6, 2017, at approximately 11:35 A.M. he was notified through a mobile application that a GPS notification from the Bank had been received indicating that the Bank had been robbed. Chief Lesher, along with other officers from the police department pursued the GPS signal as it traveled along local roads. Chief Lesher was able to determine the location of the GPS signal as it came from a gray sedan. After following the gray sedan for a short while, Chief Lesher activated his lights and siren as the sedan was at a red stop light and pulled at an angle in front of the sedan. The driver of the sedan then pulled the vehicle up an embankment and moved around the police car, upon which Chief Lesher took pursuit of the sedan. Chief Lesher continued his pursuit of the sedan through the local streets eventually losing sight of the vehicle, regaining sight of the vehicle, and losing sight again. Chief Lesher then heard the radio transmission that the sedan had been involved in an accident. Upon arriving on the scene of the accident, Chief Lesher observed that the police officers on scene had the driver of the sedan in custody, but noticed the passenger running away from the vehicle clutching what appeared to be a bag in his hand.

Officer Randall J. Morgan ("Officer Morgan") testified that on April 6, 2017, he heard the report of the robbery and the vehicle pursuit and came upon him. As the vehicle passed Officer Morgan, he observed two individuals in the front seat of the car. Officer Morgan then turned his vehicle around and began pursuing an Oldsmobile. After having pursued the vehicle a short while, Officer Morgan watched the Oldsmobile drive into a chain-link fence, whereupon, he used his vehicle to drive the Oldsmobile further into the fence and prevent it from escaping. The passenger fled the Oldsmobile, but the officers on scene were able to pull the driver, later identified as co-Defendant Hernandez, out of the vehicle and take him into custody. Officer Morgan returned to the Oldsmobile where he observed a black handgun, a pistol and an orange and white pair of gloves on the passenger side. On cross-examination, Officer Morgan admitted that he was unable to identify the passenger who fled the scene.

Sergeant Andrew Herberg ("Sergeant Herberg") of the North Lebanon Township Police Department testified that as he was approaching the scene of the accident in aftermath of the pursuit, he observed an individual wearing a dark long-sleeved shirt and jeans running toward his vehicle with another officer, Sergeant John Hess, in foot pursuit behind the individual. Sergeant Herberg then exited his vehicle, jumped over a nearby

fence and joined in pursuit of the individual. After pursuing the individual throughout yards and down alleys, the officers lost sight of the individual and decided to regroup. The officers were also receiving updates on the GPS signal and the indication was that the GPS signal was nearby to their location. As they were backtracking through the area where the individual was last seen, Sergeant Herberg noticed a porch with several items, including a lawnmower, a bicycle and a blue tarp from which he saw the individual's legs sticking out from underneath. Sergeant Herberg drew his service weapon and ordered the individual to come out and put his hands up. The gray bag full of money was found underneath the individual. Sergeant Herberg identified the individual he found and arrested that day as Appellant.

Trooper Daniel Walmer ("Trooper Walmer") of the Pennsylvania State Police testified that on the day of the robbery, he received a notification of the robbery while he was in training, but upon arrival at his barracks, he was asked to obtain a search warrant for one of Appellant's shoes and the car owned by co-Defendant Hernandez. Upon obtaining the search warrants and receiving the shoes and the vehicle into possession, Trooper Walmer searched the vehicle and found a camouflage jacket, a pair of work gloves with red palms, sunglass and two guns, later identified as BB guns. All of the items were photographed and admitted into evidence at trial for the jury to view. The search of the vehicle also yielded a green and gray hat that was later identified as a hat identical to the one that Hernandez had worn during his visit to the Bank the day before the robbery. Trooper Walmer also counted the money that was in the gray Wal-Mart bag found with Appellant, the total amount of which was $2963.00. On cross-examination, Trooper Walmer admitted that no fingerprints or DNA evidence was found on any of the items recovered.

Trooper David Lebron ("Trooper Lebron"), who is fluent in both English and Spanish, testified that on April 6, 2017, he served as an interpreter during an interview that Trooper Matthew Templin conducted with Hernandez. During the interview, Hernandez told the Troopers that he received a call from a friend asking him for a ride, however, his friend did not tell him exactly where he needed to go. After traveling from Harrisburg to Lebanon and picking up his friend, Hernandez denied knowing where the Bank was located, but admitted that he drove his friend to the Bank and that his friend directed him to take the car to a specific alley. After his friend exited the Bank and got back into the car, he directed Hernandez to drive back toward Lebanon. Hernandez admitted that he and his friend initially fled the police after they attempted to pull the car over and led the police on a high-speed chase resulting in the ensuing accident. Hernandez told Trooper Lebron that after the crash, his friend got out of the car and took off running. Hernandez denied knowledge of the robbery or of any of the handguns that were located in the car.

Trooper Robert Wessner ("Trooper Wessner"), a full-time member of the Forensic Services Unit of the Pennsylvania State Police and the trooper who processed the crime scene at the Bank, testified that the public nature of the Bank made it difficult to obtain fingerprints from the surfaces inside the bank. Moreover, obtaining shoeprint impressions was problematic as well since banks often use plastic laminate on surfaces, which doesn't keep shoe impressions very well. However, trooper Wessner was able to observe and photograph a partial shoe impression from a placemat that was on the counter where the suspect placed his foot while jumping over the counter. Trooper Wessner then compared the shoeprint impression that he photographed with a photograph of the shoe that had been collected from Appellant. Trooper Wessner found significant similarity between the shoeprint impression and Appellant's shoe. Photographs of the impression and the shoes, along with a document that Trooper Wessner created placing both the impression and photograph side-by-side for comparison, were presented to the jury. On cross-examination, Trooper Wessner admitted that the boots described were sold through Wal-Mart, which is a common seller of shoes and boots, and that Trooper Wessner could not identify the size of the boot impression obtained from the Bank.

Appellant testified that he had been underneath the tarp for approximately an hour and a half because he feared for his life and he was hiding from some people with whom he had problems that might beat him up. Appellant denied being at the Bank or participating in the robbery. Appellant further denied knowing anything about the bag of money that was found near him.

Hernandez testified that he was at his home on Harrisburg when he received a phone call from an acquaintance he knew as Bayamon through a drug rehabilitation support program, asking for a ride to Lebanon. Hernandez drove Bayamon to a certain location. Bayamon was going to try to borrow some money to give to Hernandez for gas and when Bayamon got back to the car, he told Hernandez to drive back to Lebanon. Fifteen minutes later, they were stopped at a light when the police car pulled in front of them. Hernandez claims that Bayamon then took out a gun and told Hernandez to drive and if he stopped, Bayamon would shoot him. Because Hernandez is unfamiliar with the area, Bayamon was giving him quick directions to turn here and turn there. When the car ran into the fence and the police vehicle pushed it from behind, Hernandez stayed with the car because he had no reason to run. When questioned on cross-examination, Hernandez denied that Appellant was the man that he drove with on April 6, 2017, or that Appellant had visited the Bank the day earlier.

Trial Court Opinion, 3/22/18, at 2-10 (internal citations omitted) (sic).

Following trial, the jury convicted Appellant of robbery in the first degree, conspiracy to commit robbery in the first degree, robbery in the second degree, conspiracy to commit robbery in the second degree, theft by unlawful taking, conspiracy to commit theft by unlawful taking, receiving stolen property, conspiracy to receive stolen property, terroristic threats, and simple assault. On December 20, 2017, the trial court sentenced Appellant to an aggregate term of 11½ to 47 years' imprisonment. Appellant did not file any post-sentence motions. Instead, he timely appealed to this Court. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied, raising three assertions of error:

> 1. Whether the verdict of guilt was against the weight and sufficiency of the evidence presented at trial[.]
>
> 2. Whether the [trial court] committed prejudicial error by structuring a sentence with an eleven and one-half (11.5) minimum given the testimony and evidence presented at trial[.]
>
> 3. Whether the [trial court] committed prejudicial error by not merging count II conspiracy/robbery into count 1 robbery for purposes of sentencing[.]

Rule 1925(b) Statement (unnecessary capitalizations omitted) In response, the trial court issued a Pa.R.A.P. 1925(a) opinion, concluding that Appellant is not entitled to relief.

On appeal, Appellant repeats the same issues for our review. Preliminarily, we note that we are unable to review Appellant's second issue on appeal, because he has failed to include it in the argument section of his brief, much less develop it in any coherent fashion. As a result, the second

issue is abandoned, as we cannot meaningfully review it.[2]  **See** Pa.R.A.P. 2119(a) (stating that the argument section of the parties' briefs "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctly displayed— the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."); **Commonwealth v. Johnson**, 985 A.2d 915, 924 (Pa. 2009), ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.") (citation omitted), **cert. denied**, 562 U.S. 906 (2010); **see also Commonwealth v. Murchinson**, 899 A.2d 1159, 1160 (Pa. Super. 2006) (deeming appellant's claims waived under Pa.R.A.P. 2119(a) because he did not develop meaningful argument with specific references to relevant case law and to the record to support his claims); **Commonwealth v. Heilman**, 867 A.2d 542, 546 (Pa. Super. 2005) (recognizing that failure to provide "such discussion and citation of authorities as are deemed pertinent" may result in waiver); **Commonwealth v. Cornelius**, 856 A.2d 62, 77 (Pa. Super. 2004)

---

[2] Even if it were not abandoned, Appellant still would not be entitled to relief. Because Appellant did not file any post-sentence motions, he waived his discretionary aspects of sentencing claim. **See Commonwealth v. Evans**, 901 A.2d 528, 534 (Pa. Super. 2006) (holding that the defendant's challenges to the discretionary aspects of sentencing were waived because he failed to raise the claims at the sentencing hearing or file a post-sentence motion as required by Pa.R.Crim.P. 720).

(declining to review appellant's claim where there was limited explanation and development of the argument).

We now turn to Appellant's first issue, which invokes a sufficiency and weight of the evidence challenge. With respect to the former, it is settled that to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b) statement must state with specificity the element or elements of the crime upon which the appellant alleges the evidence was insufficient. *See Commonwealth v. Garland*, 63 A.3d 339, 334 (Pa. Super. 2013); *See also Commonwealth v. Garang*, 9 A.3d 237, 246 (Pa. Super. 2010) ("[W]hen challenging the sufficiency of the evidence on appeal, the Appellant's 1925 statement must specify the element or elements upon which the evidence was insufficient in order to preserve the issue for appeal.") (quotations and citation omitted). "Such specificity is of particular importance in cases, where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Garland*, 63 A.3d at 344 (citations omitted). In *Garland*, the appellant's Rule 1925(b) statement simply stated, "[t]he evidence was legally insufficient to support the convictions." *Id.* The panel found the claim waived, noting, among other things, that the appellant "failed to specify which elements he was challenging in his Rule 1925(b) statement." *Id.*

Instantly, Appellant's sufficiency challenge, as set forth in his Rule 1925(b) statement, and reasserted in his statement of questions involved on

appeal, lacks specificity. In particular, Appellant only generally challenges the sufficiency of the evidence underlying his multiple convictions related to the armed bank robbery. Appellant fails to list the elements of the crimes in his brief upon which the evidence is insufficient. Accordingly, we conclude that Appellant has failed to preserve his sufficiency-of-the-evidence claim for lack of specificity. *See Commonwealth v. Tyack*, 128 A.3d 254, 260 (Pa. Super. 2015) (holding that appellant's "boilerplate" concise statement declaring "that the evidence was insufficient to support his conviction" was too vague even where Tyack was convicted only of one crime).

Appellant's weight of the evidence argument is also waived. Under Pa.R.Crim.P. 607, a challenge to the weight of the evidence generally must be preserved in a post-sentence motion. "As noted in the comment to Rule 607, the purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." *Commonwealth v. Gillard*, 850 A.2d 1273, 1277 (Pa. Super. 2004), *appeal denied*, 863 A.2d 1143 (Pa. 2004). A claim challenging the weight of the evidence generally cannot be raised for the first time in a Rule 1925(b) statement. *Commonwealth v. Burkett*, 830 A.2d 1034 (Pa. Super. 2003). An appellant's failure to avail himself of any of the methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the trial court responds to the claim in its Rule 1925(a) opinion. *Id.* Instantly, Appellant failed to challenge the weight of the evidence at

sentencing. Additionally, as mentioned, he did not file any post-sentence motions. Accordingly, his weight of the evidence claim is waived.

Appellant's final argument that conspiracy to commit robbery and robbery should have merged for purposes of sentencing also lacks merit. It is settled that "[t]he crime of conspiracy . . . is separate and distinct from the underlying substantive crime." *Commonwealth v. Ritter*, 615 A.2d 442, 444 (Pa. 1992). Furthermore, "the crime of conspiracy does not merge with the substantive offense that is the subject of the conspiracy." *Commonwealth v. Jacquez*, 113 A.3d 834, 838 (Pa. Super. 2015) (citations omitted).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/04/2018